UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE THE APPLICATION OF | § | |
| | § | |
| GUSTAVO SOLÍS SOTO, | § | |
| | § | |
| Plaintiff/Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:22-CV-0118-B |
| | § | |
| MARCELA ARELLANO GARCIA, | § | |
| | § | |
| Defendant/Respondent. | § | |

MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff/Petitioner Gustavo Solís Soto ("Petitioner" or "Mr. Solís")'s Verified Complaint and Petition for Return of the Child against Respondent Marcela Arellano Garcia ("Respondent" or "Ms. Arellano") (Doc. 2). For the reasons below, the Court **GRANTS** Mr. Solís's Petition and **ORDERS** that the parties' minor child, A.I.A.S. (hereinafter "the Child"), be returned to Mexico.

I.

BACKGROUND

This is a parental-child-abduction case brought under the Hague Convention on the Civil Aspects of International Child Abduction ("the Hague Convention") and the International Child Abduction Remedies Act ("ICARA").

A.    *Procedural History*

On January 18, 2022, Mr. Solís filed a Verified Complaint and Petition for Return of the Child under the Hague Convention. Doc. 2, Pet'r's Compl., 1. Petitioner's verified complaint stated

that he, "a citizen of Mexico, [sought] to secure the return of his five[-]year[-]old daughter . . . who was taken from Petitioner's custody and, without Petitioner's consent or acquiescence, wrongfully retained by her mother . . . in the United States." Doc. 2, Pet'r's Compl., 1. Upon Mr. Solís's motion, the Court entered an *ex parte* Temporary Restraining Order ("TRO") requiring Ms. Arellano to deposit her and the Child's passports with the Court and to keep Mr. Solís informed of his daughter's location until the petition was resolved. Doc. 3, Mot. TRO; Doc. 9, TRO. A Preliminary Injunction ("PI") hearing was set for fourteen days later. Doc. 9, TRO. Because of significant difficulty serving Ms. Arellano, the TRO was later extended by fourteen days and then expired before a PI hearing could be held. Doc. 11, Mot. Continue PI Hr'g; Doc. 15, Mot. Appoint U.S. Marshals Service; Doc. 16, Mot. Extend TRO; Doc. 19, Sealed Order Extending TRO; Doc. 20, Order Denying Appoint U.S. Marshals Service; Doc. 21, 2d Mot. Extend TRO; Doc. 22, 2d Mot. Continue PI Hr'g; Doc. 24, Order Denying 2d TRO Extension; Doc. 25, Notice Attempted Service; Doc. 27, Order Granting Substituted Service. Eventually, substitute service was effectuated on Ms. Arellano on February 16, 2022, and a PI hearing was set for March 1, 2022. Doc. 23, Order Granting 2d Continuance PI Hr'g; Doc. 28, Summons Returned Executed.

   At the hearing, Ms. Arellano appeared *pro se*. *See* Doc. 37, Order Appointing Counsel. Given the importance of the interests at stake and the need to expedite consideration to comply with the Supreme Court's directive that such cases be resolved "as expeditiously as possible," *see Chafin v. Chafin*, 568 U.S. 165, 179 (2013), the Court appointed counsel for Ms. Arellano and set the case for trial on March 9, 2022. Doc. 37, Order Appointing Counsel; Doc. 38, Scheduling Order. The Court entered a PI requiring Ms. Arellano to surrender the passports and allowing Mr. Solís visitation periods with the Child. Doc. 34, PI.

On March 9 and 10, 2022, the Court held a bench trial to consider Mr. Solís's petition and Ms. Arellano's affirmative defenses. Each side was ably represented by counsel and permitted to present testimony in person and via videoconference. At the conclusion of the trial, having considered the evidence and relevant authorities, the Court ruled from the bench that the Child should be returned to Mexico. *See* Doc. 62, Order. The Court now issues this Memorandum Opinion and Order to explain the Court's reasoning and present findings of facts and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1).

B.      *Factual Evidence*[1]

As in most child abduction cases brought pursuant to the Hague Convention provisions, there is little agreement between the parties as to some underlying facts. The disputed facts are so designated. The Court's credibility determinations follow its rendition of the facts.

1.      <u>Before August 7, 2021</u>

Mr. Solís and Ms. Arellano met in 2015 in Torreón, Mexico, and began a relationship. In 2016, Ms. Arellano gave birth to the couple's child. The couple lived together with the Child in Torreón for the first two years of the Child's life and separated in 2018.

During their time together, Ms. Arellano claims Mr. Solís physically abused her on two occasions—first, when she was pregnant with the Child, and again in September or October of 2017. She testified that the first time he kicked at her legs, while the second time he slapped her on her cheek. She also testified that he was verbally aggressive, cursing and insulting her. Mr. Solís claims he never hit or abused Ms. Arellano. Ms. Arellano also claims that from the time the Child was born,

---

[1] Unless otherwise indicated, the Court derives these factual accounts from testimony presented at trial.

Mr. Solís often expressed his desire that one day the Child would live in the United States to receive an American education and learn English. She testified that he planned to send the Child to live with his sister, Ivonne Solís ("Ivonne"), who resides in Killeen, Texas, and who Mr. Solís wanted to adopt the Child.

After the couple separated, the Child lived in Torreón with Mr. Solís or Ms. Arellano. Mr. Solís testified that he was the Child's sole or primary caregiver and that she always lived with him. Ms. Arellano testified that the Child lived with her during the week and with Mr. Solís on weekends. Each parent paid for the Child's food and living expenses when she was in their care and had a room for the Child in their home. Mr. Solís, who had medical insurance through his job, paid the Child's medical expenses. He also took her on several vacations to visit his family in Texas. These visits each lasted for two weeks to a month.

Beginning in 2018 and again in 2019, 2020, and 2021, Ms. Arellano traveled to the United States to work for long stretches of time, generally around six months. Mr. Solís testified that when Ms. Arellano was working in the United States he was the Child's sole caregiver and that even when she was home she did not see the Child every day. Ms. Arellano agreed that the Child lived with Mr. Solís when she was abroad, but testified that her parents also kept the Child at times. Ms. Arellano also said she sent money home to support the Child and build a house in Torreón. When Ms. Arellano was away, she communicated with the Child via frequent WhatsApp calls and videochats.

In March 2021, Mr. Solís enrolled the Child in a public kindergarten in Torreón. Because of the COVID-19 pandemic, the Child's classes were virtual. She submitted virtual homework to her teacher in Mexico from March 2021 until classes ended for the summer and was registered to resume classes for the 2021-2022 school year.

2.      <u>Mr. Solís and the Child Travel to Texas on August 7, 2021</u>

On August 7, 2021, Mr. Solís and the Child traveled by air from Torreón to McAllen, Texas, using one-way tickets purchased by Mr. Solís. The parties and their supporting witnesses presented different accounts of the intent behind this trip.

*i. Mr. Solís's and Ivonne's version of events*

According to Mr. Solís, this trip was a vacation like those he had previously taken with the Child. Though they usually traveled to Texas by ground transportation, on this trip they had to travel by plane because of U.S. entry restrictions related to COVID-19. He booked one-way tickets because he intended them to return to Mexico by bus. After arriving in McAllen, they visited the beach and then traveled to Ivonne's home in Killeen.

While in Killeen, Mr. Solís and Ivonne attempted to enroll the Child in a virtual pre-kindergarten program that they believed would be available through the Killeen Independent School District ("KISD"). They submitted to KISD an online "New to KISD Student Registration" form. Resp't's Ex. 6, KISD Registration. This form listed Ivonne's address as the Child's "physical address" and that "the student's current address [residing with Ivonne in Killeen] is a temporary living arrangement." *Id.* at SOLIS000328, 333. It listed Mr. Solís and Ivonne as the Child's "Parent/Guardian 1" and "Parent/Guardian 2," respectively, but did not list Ms. Arellano in any capacity. *Id.* at SOLIS000330–331.The form indicated that Ivonne's relationship to the Child was "Aunt." *Id.* at SOLIS000330, 333.The form indicated that the Child would begin attending school on August 16, 2021—the first day of school for the 2021-2022 school year—and that the applicant was interested in "District-provided [bus] transportation." *Id.* at SOLIS000329. Mr. Solís and Ivonne testified that the intention was for the Child to begin attending virtual classes while staying in Killeen

and then continue in those virtual classes after she returned to Mexico, all the while continuing with her virtual program at the Mexican school.

After fifteen days in Texas, on August 22, 2021, Mr. Solís returned to Mexico because of a work emergency. The Child remained with Ivonne in Killeen. Mr. Solís said he planned to return in September and take her back to Torreón, where she remained enrolled in her Mexican kindergarten. In preparation for her return, he volunteered at the school readying classrooms for a return to in-person learning.

ii.    *Ms. Arellano's version of events*

According to Ms. Arellano, the August 7, 2021, trip to Texas was not a vacation but an attempt to implement Mr. Solís's longstanding plan for the Child to live with Ivonne and attend school in Texas. Initially, she did not object to the trip, but then a series of Mr. Solís's actions made her suspect the move was intended to be more permanent. First, on August 4, 2021, Mr. Solís asked her to talk to the Director at the Child's Mexican kindergarten to request an updated certificate of studies. Next, on August 9, 2021, two days after arriving in Texas, Mr. Solís asked her to send him photos of the Child's vaccination records "for the kindergarten registration." However, she believed this was for the school in Mexico. On August 23, 2021, he asked her to attend a meeting at the kindergarten in Torreón the next day and to pay the school 500 pesos—half a year's registration fee. But when her mother went to the school and attempted to pay, the teacher informed her that the Child would not be attending that school any longer. So the following day, on August 25, 2021, Ms. Arellano messaged Mr. Solís asking if he had enrolled the Child in school in Texas. Mr. Solís admitted that he had—but insisted that she would also still attend school in Mexico and that the Mexican school had not accepted her payment because he had already paid for the whole year. Pet'r's

Ex. 5-A, WhatsApp Messages Translation, SOLIS000007. Ms. Arellano was not persuaded. She was not opposed to the Child's attending school in Texas, but did not want her to live with Ivonne in Killeen. Via WhatsApp message, she told Mr. Solís "You asked me to take her on vacation, not to put her in school in the United States. . . . I'm going to go get her." *Id.* at SOLIS000008.

       3.      <u>Ms. Arellano Takes the Child on August 28, 2021</u>

On August 28, 2021, Ms. Arellano drove to Ivonne's residence in Killeen. Ms. Arellano took the Child and the Child's passport. Mr. Solís's Verified Petition and Complaint states that she promised she would return the Child to him in Mexico in three days. Instead, Ms. Arellano brought the Child to Dallas, Texas. She did not inform Mr. Solís of her—or the Child's—whereabouts.

       4.      <u>Mr. Solís and Ms. Arellano's Communications After August 28, 2021</u>

Between August 28, 2021, and September 21, 2021, Mr. Solís and Ms. Arellano communicated frequently via WhatsApp. *Id.* at SOLIS000009–000019. On September 18, 2021, Ms. Arellano messaged saying: "Well, just to tell you that we are no longer going to live in Torreón, we will settle in Monterrey for a while[.]" *Id.* at SOLIS000009. Mr. Solís responded, "Ok very good." *Id.* However, Ms. Arellano testified that she was not intending to live in Monterrey but was lying to Mr. Solís. On September 21, 2021, the pair exchanged numerous messages discussing their custody dispute. *Id.* at SOLIS000013–000018. The exchange ended with Ms. Arellano stating, "I am leaving you[,] you are a manipulator[.] Bye[.]" *Id.* at SOLIS000018. On September 25, 2021, Mr. Solís asked Ms. Arellano, "Where is my daughter[?]" *Id.* at SOLIS000019. On September 29, 2021, he messaged, "I want to know about my daughter." *Id.* On October 6 he messaged, "where can I see [the Child][?]" *Id.* Mr. Solís did not receive any response from Ms. Arellano until October 16, 2021, when she sent him two responses and then again ceased communication. *Id.* at SOLIS000018–19.

Between August 28, 2021, and February 28, 2022, Mr. Solís did not see the Child in person and had limited contact with her via WhatsApp. In October 2021, he filed his Hague Convention petition with Mexican authorities, beginning the instant action. Until shortly before February 28, 2022, he was not aware of the Child's exact whereabouts, though he and his family tried to find her once they learned she was in Dallas.

    5.    <u>The February 28, 2022 Altercation in Dallas, Texas</u>

On February 28, 2022, the day before the PI hearing in this action, Mr. Solís and Ivonne went to the Dallas apartment complex where they had learned Ms. Arellano and the Child were residing with Ms. Arellano's boyfriend, Pablo Sergio Flores Cruz ("Pablo"). Mr. Solís and Ivonne gained access to the apartment complex, waited for Pablo to arrive, and followed him to his apartment. Initially, Pablo refused to allow them access to his apartment and insisted that Ms. Arellano and the Child were not there. Eventually, Ms. Arellano came to the door and allowed Mr. Solís and Ivonne to enter. The Child was in the bedroom but came into the living room and hugged Mr. Solís. The situation between the adults became heated. Mr. Solís and Ivonne testified that Pablo attempted to physically take the Child from Mr. Solís's arms and was cursing at him and telling him he would never see his daughter again. Ms. Arellano and Pablo testified that Mr. Solís was shouting "se los va a cagar la chingada" (a Spanish slang phrase that Ms. Arellano and Pablo testified was a death threat) at Ms. Arellano in the presence of the Child. At various time during the altercation, Pablo shouted "go [expletive] your mother" at Mr. Solís. Ivonne and Pablo each threatened to call the police and Pablo threatened to call his lawyer. The police eventually were called. Before the police arrived, Pablo either removed Mr. Solís and Ivonne from the apartment or asked them to leave, and then followed them down to the parking lot, where the men continued to trade insults

until Mr. Solís charged at and punched Pablo. Ms. Arellano and the Child saw the parking lot altercation from the second floor area outside Pablo's apartment. Mr. Solís and Ivonne testified that during these events they feared for their safety because of Pablo's cursing and threatening actions, and Pablo testified that he feared for the safety of Ms. Arellano because of Mr. Solís's threatening words and past actions to Ms. Arellano.

C.    *Credibility Determinations of Fact Witnesses*

  1.    Mr. Solís

The Court did not find credible Mr. Solís's testimony that the Child's travel to Texas was intended to be only a vacation and that she would have returned to Mexico in September 2021. The WhatsApp messages between Mr. Solís and Ms. Arellano show he intended for the Child to stay with Ivonne in Killeen for an indefinite time. Further, the Killeen ISD new student enrollment form he and Ivonne submitted indicated that the Child would be residing at Ivonne's address, she would need bus transportation during the school year, Ivonne would be the first emergency contact, and Ivonne and Mr. Solís—not Ms. Arellano—were her guardians. Moreover, the Court did not find credible Mr. Solís's testimony that he never hit Ms. Arellano during their relationship, but credited Ms. Arellano's testimony that he hit her once during her pregnancy and a second time in 2016 or 2017.

Mr. Solís's credibility was undermined by his statements that Ms. Arellano had cut off all communication with him after she took the Child on August 28, 2021, when WhatsApp messages showed that the two communicated frequently in September and October 2021 and sporadically thereafter. The Court also found that evidence of the timing of Mr. Solís's payment to the Mexican kindergarten tended to undermine his assertion that he always intended the Child to attend both the Mexican and Texas schools, virtually.

However, the Court did find credible Mr. Solís's uncontradicted testimony that: (1) until August 7, 2021, he was the Child's primary caregiver in Torreón; (2) the Child lived with him during Ms. Arellano's six-month stays in the United States during 2018, 2019, 2020, and 2021, and with him or Ms. Arellano in Torreón during the other six months of those years; (3) the Child attended school in Mexico before August 7, 2021; and (4) the Child received vaccinations and other medical care in Torreón. Moreover, the Court found credible Mr. Solís's testimony that he did not give his consent for the Child to live in Dallas with Ms. Arellano and that Ms. Arellano concealed the Child's whereabouts from him beginning on August 28, 2021, which was corroborated by the WhatsApp messages. Finally, the Court found credible Mr. Solís's testimony that the Child was safe in his custody.

2.      Ms. Arellano

The Court found Ms. Arellano's testimony credible. The Court credited Ms. Arellano's testimony that Mr. Solís intended to enroll the Child in in-person kindergarten in Killeen and for the Child to live indefinitely with Ivonne, because this version of events was supported by the WhatsApp messages. The Court also credited Ms. Arellano's testimony that Mr. Solís hit her twice during their relationship, and that during the February 28, 2022, altercation at Pablo's apartment he shouted the phrase "se los va a cagar la chingada" at Ms. Arellano in the Child's presence and punched Pablo while the child watched from the second floor with Ms. Arellano. The Court found that Mr. Solís was the aggressor in the altercation with Pablo, in part because video of the altercation showed Mr. Solís charging at Pablo from a significant distance in order to punch him. Resp't's Ex. 1, Video of Parking Lot Incident. However, the Court did not find credible Ms. Arellano's claims that the Child would be at grave risk of harm from Mr. Solís if she was returned to Mexico or that

Mr. Solís consented that the Child could live with her in Texas.

### 3.    Petitioner's Supporting Witnesses

Mr. Solís's supporting witnesses were Ivonne and the Child's teacher from her kindergarten in Mexico. The Court did not find Ivonne's testimony credible, as she appeared to have strong familial loyalty to Mr. Solís and merely supported his version of events. While the Court found the Child's teacher credible, she had limited knowledge of Mr. Solís's intentions regarding the Child and the Court regards her testimony as neutral.

### 4.    Respondent's Supporting Witnesses

Ms. Arellano's boyfriend, Pablo, testified in support of respondent. The Court found Pablo's demeanor and testimony credible when he related the details of the incident at his apartment complex on February 28, 2022. His and Ms. Arellano's version of some parts of this incident was supported by video evidence. *See* Resp't's Ex. 1, Video of Parking Lot Incident.

## II.

## LEGAL STANDARD

"The [Hague] Convention was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). It "seeks 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Chafin*, 568 U.S. at 168 (quoting Art. 1, S. Treaty Doc. No. 99–11, at 7).[2] "Article 3 of the Convention provides that the 'removal or the

---

[2] The Court takes judicial notice that the United States and Mexico are contracting parties. *See* Hague Conference on Private Int'l Law, Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child

retention of a child is . . . wrongful' when 'it is in breach of rights of custody attributed to a person . . . , either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention' and 'at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.'" *Id.* (quoting Article 3).

"The United States has implemented the Convention through the ICARA." *Abbott*, 560 U.S. at 9. "The statute authorizes a person who seeks a child's return to file a petition in state or federal court." *Id.* (quoting 42 U.S.C. §§ 11603(a)–(b), (d)). The court considering the petition shall "determine . . . rights under the Convention [but] not the merits of any underlying child custody claims." *Smith v. Smith*, 976 F.3d 558, 561 (5th Cir. 2020) (quoting 22 U.S.C. § 9001(b)(4)). If the court finds the child at issue "to have been wrongfully removed or retained, [she is] ' . . . to be promptly returned'" unless an exception applies. *Chafin*, 568 U.S. at 169 (quoting § 11601(a)(4)). The return remedy "was designed to 'restore the pre-abduction status quo.'" *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996)). Finally, "[c]ourts . . . should take steps to decide these cases as expeditiously as possible." *Chafin*, 568 U.S. at 179.

## III.

## ANALYSIS

To begin, the Court believes that each parent in this case acted, or intended to act, in violation of the other's custodial rights under the law of Coahuila, which grants unmarried parents

---

Abduction, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24.

of a child shared custodial rights and duties when—as here—there is no order to the contrary.[3] *See Castro*, 872 F. Supp. 2d at 554–55. Mr. Solís acted improperly in seeking to relocate the Child to live and attend school for an indefinite period of time with Ivonne without Ms. Arellano's consent. In effect, he attempted to wrongfully remove the Child from her habitual residence in Torreón, Mexico. Ms. Arellano also acted improperly when she took the Child from Ivonne's residence in Killeen, Texas, on August 28, 2021, and failed to return her to Mexico.

However, the Hague Convention does not permit this Court to assign blame or assess the merits of any parent's claim to custody, but aims to restore the *pre-removal* status quo. *See Sealed Appellant*, 394 F.3d at 344. Accordingly, below the Court finds that Mr. Solís has carried his burden to show that the Child's habitual residence is Torreón, Mexico, he had established and was exercising his custodial rights under Mexican law, and the Child was wrongfully retained in the United States by her mother, Ms. Arellano. Next, the Court finds that Ms. Arellano has not established her affirmative defenses of grave risk of harm or consent. Therefore, the Court **GRANTS** Mr. Solís's petition for the Child's return to Mexico.

---

[3] Petitioner's trial brief asserts that "[t]he Civil Code of Coahuila [("Civil Code")] recognizes the doctrine of *patria potestas*" and that under this doctrine "[p]arental authority is inalienable and those who exercise it cannot be deprived of it, except in cases provided for in [the Civil Code]." Doc. 29, Pet'r's Trial Br., 7 (first citing Código Civil de Coahuila, Art. 339, Diario Oficial de la Federación 15-12-2015, últimas reformas DOF 27-11-2020 (Mex.); then quoting *id.* at Art. 401). At trial, Respondent did not challenge Petitioner's characterization of Coahuila law or that Petitioner and Respondent had shared custody under that law. Therefore, the Court finds that Mr. Solís and Ms. Arellano had shared custody under the law of Coahuila, Mexico. C.f. *Castro v. Martinez*, 872 F. Supp. 2d 546, 554–55 (W.D. Tex. 2012) ("The state of Coahuila . . . recognizes the doctrine of patria potestas. Pursuant to that doctrine both parents have joint custody rights.").

For an explanation of the doctrine of *patria potestas* as applied to unmarried parents, see *Whallon v. Lynn*, 320 F.3d 450, 456–7 (1st Cir. 2000).

A.      *Petitioner's Prima Facie Case*

To establish a prima facie case in an Article 3 Hague Convention claim for wrongful removal

or retention a petitioner must prove three elements by a preponderance of the evidence:[4]

> (1) "the respondent removed or retained the child somewhere other than the child's
> habitual residence"; and
> (2) "the removal or retention violated the petitioner's 'rights of custody' under the
> habitual-residence nation's laws"; and
> (3) "at the time of removal or retention those rights were actually exercised, either
> jointly or alone, or would have been so exercised but for the removal or retention."

*Vazquez v. Vasquez*, 2013 WL 7045041, at *16 (N.D. Tex. Aug. 27, 2013) (quoting *Larbie v. Larbie*,

690 F.3d 295, 307 (5th Cir. 2012), *abrogated on other grounds by Monasky v. Taglieri*, 140 S. Ct. at

727–29.).

The Court finds Mr. Solís has met this burden.

1.      Habitual Residence

First, the Court finds that—considering all the facts and circumstances—Mr. Solís proved

by a preponderance of the evidence that Torreón, Coahuila, Mexico, is the Child's "habitual

residence." *See Monasky*, 140 S. Ct. at 726, 730 (noting that habitual residence is "[t]he place where

a child is at home, at the time of removal or retention" and that the Court is to consider the totality

of the circumstances). Testimony and other evidence established that the Child was born in and

spent her entire life up to August 7, 2021, living in Torreón, except for short vacations. Pet'r's Ex.

1, Birth Certificate. She attended school in Mexico, received medical care in Mexico, and the

majority of her belongings remained at her parents' homes in Mexico. Pet'r's Ex. 2, Vaccination

---

[4] Petitioner has also provided competent evidence that the Child is under the age of sixteen, so the
Hague Convention return provisions apply. *See* Pet'r's Ex. 1, Birth Certificate.

Records; Pet'r's Ex. 4-A, Medical Insurance; *see Smith*, 976 F.3d at 562–63 (considering the relative length of time spent by the children in each country, their countries of birth, and which country the parents owned property in). By contrast, the Child resided in Killeen, Texas, for—at most—three weeks before August 28, 2022.

Further, shared parental intent is a factor that courts may consider in the totality of the circumstances analysis. *See Monasky*, 140 S. Ct. at 727–29; *Smith*, 976 F.3d at 563. Where parents do not have a current shared intent for where their Child should live, the Court may consider their last shared intent. *See, e.g., Cartes v. Phillips*, 240 F. Supp. 3d 669, 680 (S.D. Tex. 2017) (citing *Berezowsky v. Ojeda*, 765 F.3d 456, 479 (5th Cir. 2014) (Haynes, J., dissenting)).

Here, one parent intended the Child to live with her aunt in Killeen, Texas, and the other objected to that plan. *See* Pet'r's Ex. 5-A, WhatsApp Messages Translation, SOLIS000007–000008. Even if they both hoped for the Child to live somewhere in Texas, they had no shared intent regarding a single location or custodial arrangement in the United States. Later, Ms. Arellano messaged that she and the Child intended to settle in Monterrey, Mexico, for a while—a plan to which Mr. Solís appeared to acquiesce. *Id.* at SOLIS000009 (showing Ms. Arellano's message that she and the Child intended to settle in Monterrey and Mr. Solís's response of "Ok very good"). However, Ms. Arellano testified that she was lying to Mr. Solís when she indicated she planned to reside in Monterrey and that she was living in Dallas at the time. In either scenario, the parties' last shared intent was for the Child to live in Mexico.

In sum, considering all the facts and circumstances, it cannot be said that the Child "lived" in Killeen after such a short time—especially as her mother had not consented to the arrangement. *See Monasky*, 140 S. Ct. at 726 ("[A child's] residence in a particular country can be deemed

-15-

'habitual,' however, only when her residence there is more than transitory. 'Habitual' implies '[c]ustomary, usual, of the nature of a habit.'") (quoting Black's Law Dictionary 640 (5th ed. 1979)); Pet'r's Ex. 5-A, WhatsApp Messages Translation, SOLIS000007–000008 (indicating Ms. Arellano objected to the plan for the Child to reside with Ivonne).

Therefore, the Court finds that Mexico is the Child's habitual residence.

2. Exercising Custody

"Courts charged with deciding 'exercise' under the Convention must not cross the line into a consideration of the underlying custody dispute." *Sealed Appellant*, 394 F.3d at 344. "Accordingly, in the absence of a ruling from a court in the child's country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of those rights." *Id.* at 345. Thus, "[t]o show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child." *Id.*

Ms. Arellano did not dispute that under the law of Coahuila, Mexico, Mr. Solís had custody rights at the time of the wrongful retention or argue that Mr. Solís abandoned the Child when he left her with Ivonne in Killeen. *See Sealed Appellant,* 394 F.3d at 343. Thus, the court finds that Mr. Solís and Ms. Arellano had shared custody rights under Mexican law and immediately before the time period at issue both parents were exercising their custodial rights. *See Castro,* 872 F. Supp. 2d at 554–55 (applying Coahuila law); *see also Whallon,* 230 F.3d at 453 (discussing an unmarried, noncustodial parent's *patria potestas* rights).

Therefore, the Court finds that Mr. Solís was exercising custody rights at the time of the retention.

3.     Wrongful Retention

Retention or removal is wrongful under the Hague Convention when it is done in violation of the left-behind parent's custodial rights under the law of the habitual residence. *See Vazquez,* 2013 WL 7045041, at *16 (quoting *Larbie,* 690 F.3d at 307). As discussed above, the Court finds that Ms. Arellano's retention of the Child in Dallas, Texas, violated Mr. Solís's shared custodial rights under Mexican law. *See Vazquez,* 2013 WL 7045041, at *22; *Whallon,* 230 F.3d at 453.

Therefore, the Court finds that Mr. Solís has shown a wrongful retention.

In sum, the petitioner, Mr. Solís, has carried his burden and established a *prima facie* case for return under the Hague Convention.

B.     *Respondent's Affirmative Defenses*

Next, the Court considered the two affirmative defenses presented by the respondent, Ms. Arellano. "The Convention recognizes certain exceptions to the return obligation." *Monasky,* 140 S. Ct. at 723. The Court has discretion in deciding whether to deny return based on an exception and should construe the exceptions narrowly. *England v. England,* 234 F.3d 268, 270–71 (5th Cir. 2000).

1.     Grave Risk of Harm

"[A] child's return is not in order if the return would place her at a 'grave risk' of [physical or psychological] harm or otherwise in 'an intolerable situation.'" *Monasky,* 140 S. Ct. at 723 (quoting Art. 13(b)). "[S]ustained spousal abuse can, in some instances, create such a risk." *Soto v. Contreras,* 880 F.3d 706, 712–13 (5th Cir. 2018) (citing *Madrigal v. Tellez,* 848 F.3d 669, 676–77 (5th Cir. 2017)). However, the Fifth Circuit has explained that "[f]indings of grave risk are rare" and "[t]he person opposing the child's return must show that the risk to the child is grave, not merely

serious." *Soto*, 880 F.3d at 710 (first quoting *Delgado v. Osuna*, 2015 WL 5095231, at *13 (E.D. Tex. Aug. 28, 2015), *aff'd*, 837 F.3d 571 (5th Cir. 2016); then quoting *Hague International Child Abduction Convention; Text and Legal Analysis*, 51 FR 10494–01, 1986 WL 133056 (Mar. 1986)). The party opposing return for this reason must "prove the existence of such a grave risk by clear and convincing evidence." *England*, 234 F.3d at 270. The clear and convincing evidence standard requires:

> that weight of proof which "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts" of the case.

*Soto*, 880 F.3d at 711 (quoting *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992) (quoting *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 285 n.11, (1990))).

Here, Ms. Arellano testified that Mr. Solís physically abused her on two occasions: the first, by kicking at her legs while she was pregnant with the Child, and the second, by slapping her on the cheek in 2016 or 2017. She also testified that he was verbally abusive to her by insulting her and that he disregarded her wishes and opinions about how the Child should be raised. Ms. Arellano testified that she did not seek help from or report the abuse to authorities in Mexico. However, she also testified that she believed that Mr. Solís's relationships with the police in Torreón meant that the police would not help her if she reported a fight with him to them.

The February 28, 2022, incident at Pablo's apartment is additional evidence of Mr. Solís's physical and psychological aggression toward Ms. Arellano. In the presence of the Child, Mr. Solís shouted "se los va a cagar la chingada" at Ms. Arellano, a slang phrase she claimed is a death threat. Mr. Solís also punched Pablo while Ms. Arellano and the Child watched from the second floor. The Court does not discount these actions.

Nevertheless, the Court finds that the two instances of physical abuse and the insulting/controlling behavior that Ms. Arellano testified Mr. Solís subjected her to, coupled with Mr. Solís's actions on February 28, 2022, do not show a "grave risk of physical or psychological harm" to the Child under the clear and convincing evidence standard. *C.f. Madrigal*, 848 F.3d at 677 (collecting cases). Here, the physical violence alleged—while reprehensible—was two incidences of kicking and slapping, not the kind of "substantial violence" against a spouse that other courts have cited as constituting "grave risk." *See id.* Nor was the alleged death threat "concrete," though it occurred in the Child's presence. *See id.* Most importantly, the parties did not present any evidence that the Child was in grave risk of harm in 2018, 2019, 2020, and 2021, when she lived solely or primarily with Mr. Solís during Ms. Arellano's stays in the United States, or why circumstances have changed such that she would face such a risk now.

Therefore, the Court finds that Ms. Arellano has not met her burden to show that the Child's return poses a grave risk of physical or psychological harm or would otherwise place the child in an intolerable situation.

2.      Consent/Aquiescence

"The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005) (citation omitted). "The focus of inquiry is 'the petitioner's subjective intent' . . . as 'evinced by the petitioner's statements or conduct, which can be rather informal.'" *Larbie*, 690 F.3d at 308 (first citing *Baxter*, 423 F.3d 371, then citing *Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010)). The key consideration is "what the petitioner actually contemplated and agreed to in allowing the child to

-19-

travel outside [her] home country." *Id.* at 309. "The nature and scope of the petitioner's consent, and any . . . limitations, should be taken into account." *Id.* (quoting *Baxter*, 423 F.3d at 371).

Here, Ms. Arellano has not shown by a preponderance of the evidence that Mr. Solís consented to her retention of the Child in Dallas, Texas, or her concealment of the Child during that time. Indeed, the evidence shows that he did not. Mr. Solís's messages to Ms. Arellano in the fall of 2021 indicate that his actual intent in bringing the Child to Texas was for her to live for an indefinite time with Ivonne in Killeen. There is no evidence to indicate he brought the Child to Texas to live with Ms. Arellano in Dallas—in fact he did not know that is where she was. Ivonne testified about the efforts she and Mr. Solís's family made on his behalf to locate the Child in Dallas, and the Court credits this testimony as credible. Accordingly, the evidence of Mr. Solís's subjective intent shows he did not consent to the retention.

Therefore, the Court finds Ms. Arellano has not carried her burden on the consent defense.

## IV.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

To summarize, the Court makes the following findings of fact and conclusions of law:

A.    *Findings of Fact*

- The Child's habitual residence is Torreón, Coahuila, Mexico.

- Petitioner and Respondent each have custodial rights under the law of the state of habitual residence.

- Petitioner and Respondent were each exercising their custodial rights under the law of the state of habitual residence immediately prior to August 28, 2022.

- Beginning on August 28, 2022, Respondent wrongfully retained the Child in the United

States, in violation of Petitioner's custodial rights.

- Petitioner did not consent or acquiesce to the Child's retention in the United States.

- The Child's return to Mexico will not place her at grave risk of psychological or physical harm.

B.   *Conclusions of Law*

- Petitioner has proven by a preponderance of the evidence each element of his claim for return under Article 3 of the Hague Convention.

- Respondent has not proven by clear and convincing evidence that the "grave risk of harm" exception applies.

- Respondent has not proven by a preponderance of the evidence that Petitioner consented to or acquiesced in the Child's retention in the United States after August 28, 2022.

## V.

## CONCLUSION

For the reasons given above, and as stated on the record at the conclusion of trial, the Court **ORDERS** that the Child A.I.A.S. be returned to Mexico in the manner set forth in the Court's Order Accepting the Stipulated Plan for Return (Doc. 65).

**SO ORDERED.**

**SIGNED: March 15, 2022**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

-21-